769 S.E.2d 254

The STATE, Respondent,

v.

Darryl L. DRAYTON, Appellant.

Appellate Case No. 2012–213295.

No. 5294.

Court of Appeals of South Carolina.

Heard Nov. 3, 2014.
Decided Feb. 4, 2015.
Rehearing Denied March 19, 2015.

Appellate Defender Susan B. Hackett, of Columbia, for Appellant.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General

536

W. Edgar Salter, III, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

SHORT, J.

Darryl L. Drayton appeals his murder conviction, arguing the trial court erred in (1) refusing to charge the jury concerning how to consider circumstantial evidence; (2) admitting evidence when the search warrant lacked probable cause; and (3) limiting Drayton's cross-examination of the pathologist concerning the victim's toxicology report. We affirm.

**FACTS**

Michael Bartley testified he was engaged to the victim, Alexis Lukaitis, and had given her an engagement ring. Bartley and the victim had twenty-two-month-old twin boys. Bartley testified the victim took unprescribed medication and received the pills from "D," whom he identified in the courtroom as Drayton. Bartley explained the victim had received pills from Drayton in the past in exchange for driving him places.

Bartley testified the victim was friends with a neighbor, Shannon Hooper, who lived in their apartment complex in Bluffton. According to Bartley, Drayton was "always" at Hooper's apartment. Hooper's former sister-in-law, Tina Johnson, was also at Hooper's apartment, and the victim would "get pills from them."

On Sunday, August 8, 2010, Bartley prepared the twins to go to his mother's house for dinner, which was a recurring family event for Bartley, the victim, and the twins. The victim experienced an allergic reaction to a fabric softener dryer sheet and did not accompany Bartley. According to Bartley, the victim called him at 6:00 p.m., indicating she was going to drive "Darryl" to Charleston to get pills. Bartley testified he last spoke to the victim at 8:19 p.m. that evening. At the time, the victim was on the road. Bartley testified the victim confirmed she was with "D"; she said "make a right here" as though speaking to someone in the vehicle; Bartley heard a person speak to her in a voice too muffled for him to distinguish; and she told Bartley she loved him and would be home soon. At approximately 10:00 p.m., Bartley called the victim's cell phone, and it appeared to answer and sounded muffled,

"like I thought she was digging her phone out of the purse. And then it got quiet. And I was like hello, hello. And then it hung up, and that was it." Bartley attempted "all night" to reach the victim by phone and also called hospitals, jails, and police stations looking for her.

The following morning, Monday, August 9th, Bartley reported the victim missing to the police and Detective Todd Calhoun of the Beaufort County Sheriff's Office (BCSO) responded. Both Calhoun and Bartley attempted to reach Drayton by phone. Calhoun called Drayton's cell phone, and Drayton identified himself and agreed to meet Calhoun at Drayton's house, but he did not show. After numerous attempted calls by Bartley, Drayton answered and denied going to Charleston with the victim.

Bartley drove with Hooper along Highway 17 looking for the victim's vehicle. After he returned home, Bartley saw an internet report that a body had been found in Charleston, and he called the Charleston police. He described the victim, including two small tattoos. He also shared the cell phone numbers of the victim, Hooper, and Drayton.

Johnson testified she met the victim through Hooper. On Monday, Bartley arrived at her house very early looking for the victim. Johnson told her eleven-year-old son about the visit and that the victim had allegedly driven Drayton to Charleston and was missing. The son knew Drayton from meeting him at Hooper's house.

Johnson further testified Drayton lived in a brick house next door to a Bluffton self-help facility, and she and the victim had been there to meet Drayton. Later on Monday, Johnson, her son, and other family members were at the self-help facility. Johnson's son told her he saw Drayton. Johnson notified the police. At trial, the son testified Drayton was in the parking lot at the self-help facility. According to the son, Drayton had scratches on his face, a bandage on his finger, and a hospital bracelet.

Jackie Seward, a professional logger in Hollywood, South Carolina, testified he was driving onto his family's property on Monday, August 9th, when he saw the victim's body on the side of the road. He notified the police. Deputy William Shepherd of the Charleston County Sheriff's Office (CCSO)

and James Thomas Milz, a forensic investigator for the CCSO, responded. Milz testified the victim suffered a large laceration to the throat and her clothing and limbs were charred. It appeared she had been moved because a bloody handprint was on her ankle.

Milz photographed footprints and tire marks at the scene. Milz also took cast impressions of the tire marks. Vicki Hallman, a South Carolina Law Enforcement Division (SLED) employee in the latent prints crime scene unit, testified the tests on the tire impressions were not totally exclusive and the tracks could have been made by the victim's vehicle, a 2001 white Pontiac Grand Prix, or another vehicle with Michelin Symmetry tires. Paul McManigal, the supervisor of forensic services for the CCSO, testified he was at the scene with Milz. McManigal testified no usable fingerprints were obtained from the victim's body.

Stephen Edwards of Bluffton testified he was Drayton's cousin. On Monday morning, August 9, 2010, Drayton knocked on Edwards' door, waking him and asking for a ride to the hospital. Drayton's hand was wrapped in bloody tissue, and he told Edwards he had been in a fight with three men from Beaufort and suffered a cut on his finger. Edwards did not have gas in his car so Drayton left, returning approximately ninety minutes later with five dollars for gas. Edwards took Drayton to the emergency room at a hospital in Hilton Head. When they left the hospital, Edwards took Drayton to a jewelry store because Drayton claimed he wanted to pawn a class ring. At Drayton's request, they registered and checked into a motel in Hardeeville for that night.

On Tuesday, Edwards drove Drayton to a plastic surgeon for further treatment on his finger, and they spent a second night at the motel. According to Edwards, Drayton requested a ride to Florida, but Edwards refused, and on Wednesday morning, he dropped Drayton off at the library in Bluffton. Edwards spent the day receiving medical treatment for high sugar levels. When he arrived at his home on Wednesday evening, he discovered bloodied, foreign trash on his porch, including a spare tire, speakers, diapers and a diaper bag, a blanket, and a CVS bag filled with clothes. He called 911 from a neighbor's apartment and reported the bloody trash.

Detective Calhoun responded, and retrieved the trash. Bartley identified numerous items found at Edwards' house as belonging to the victim, including the diaper bag and blanket. He also testified numerous items did not belong to the victim, including the CVS bag, clothing, and a speaker box.

Dr. Luca Delatore testified he treated Drayton on the morning of August 9th for a finger laceration, reportedly inflicted by a saw the previous evening. An x-ray revealed a fracture of the bone, which was exposed from the laceration. Delatore prescribed an antibiotic and pain medication. Maggie Mae Furchak testified she knew Drayton, and he came to the pharmacy where she worked on Monday to fill two prescriptions. Drayton told her he cut his finger at work that morning on a piece of glass.

Christopher Golis testified he worked at Golis Family Jewelers in Bluffton. He knew Drayton and testified he purchased an engagement ring from Drayton on August 9, 2010. Golis testified Drayton claimed he found the ring at a gas station. Golis described the ring as a unique, three-stone "past, present, future" ring. Golis noticed Drayton's bandage, and Drayton told Golis he cut his finger on a saw working for a fence company. Golis later received a telephone call from Detective Calhoun. Golis identified Drayton from a photographic line-up and surrendered the ring. Bartley identified the ring as the victim's engagement ring.

Sargent Robert DiCarlo of the BCSO testified he responded to a call on August 10, 2010, regarding the Bluffton Police Department finding what was suspected to be the victim's vehicle parked on Wharf Street in Bluffton. Upon arrival at the scene, he noticed what appeared to be blood near the trunk. Bartley identified the vehicle as belonging to the victim.

Kimberly Dinh, then of SLED, testified she specialized in processing crime scenes and processed the vehicle. She located suspected blood on numerous surfaces of the vehicle, including in the interior, inside the driver's door, on the passenger seat, on the back of the car, on the license tag, below the tag, and on the passenger side door of the vehicle. She also located strands of hair. The trunk had been "mostly cleaned out", the spare tire was missing, and there was water

in the trunk. Dinh collected twenty-one swabs of suspected blood or DNA, including two DNA swabs from the steering wheel and two swabs from the driver-door pull.

Drayton was arrested Wednesday, August 11th. Investigator John G. Adams of the BCSO photographed Drayton the day of his arrest, noting scratches around his neck, in the center of his chest, on his forearm, on the palm of his hand, and noting the injury to his finger. Adams admitted the photographs did not show scratches on the right side of Drayton's face.

Catherine Leisy, a SLED forensic scientist, testified she tested DNA from the victim, Bartley, and Drayton. With probabilities of one in 3 million and one in 1.9 trillion, Drayton's DNA was found on the victim's driver's side rear window; the driver's door; and the driver's doorframe. DNA from the steering wheel was a mixture of two individuals with the major contributor matching Drayton and the minor contributor not exclusive of the victim. Leisy also tested cuttings from the diaper bag and tire cover found in Edwards' trash and concluded they contained the victim's DNA and had a matching probability of one in 50 quadrillion. As to the DNA on the victim's shoes found at the crime scene, the DNA matched the right shoe with a matching probability of one in 340 million and the left shoe with a matching probability of one in 1.9 quadrillion. Finally, the CVS bag contained DNA from at least two individuals, with Drayton's DNA the major contributor and the minor contributor insufficient for reliable interpretation.

Subject to Drayton's objection to admissibility, the parties stipulated to Drayton's cell phone number, and the State called Kenneth Ray Aycock, Jr., of the Army National Guard's counter-drug task force as a witness. Aycock testified he primarily analyzed cellular phone analysis and tracking for the FBI. Aycock created maps to illustrate his findings regarding the use of Drayton and the victim's cell phones.

Aycock testified the review of the victim's cell phone use on August 8th showed use beginning in the Bluffton area. The cell phone was used between 8:19 and 9:49 p.m. in the Ravenel area. Calls after 9:49 p.m. were unanswered or went to voicemail and did not contain cell-site data. At 8:19 p.m., the

victim's phone made an eighty-six second call, and at 9:49 p.m., the phone received an unanswered call that went to voicemail but contained cell-site data. Both calls were to or from Bartley's phone. There were also seven calls from Bartley's number that went to the victim's voicemail. After 9:49 p.m., there was no cell-site data.

As to Drayton's cell phone, Aycock testified calls on August 8th between 9:08 a.m. and 6:36 p.m. were made in the Bluffton area. At approximately 7:20 p.m., Drayton's phone began hitting towers along Highway 17 into Charleston. Between 7:20 and 7:52 p.m., his phone registered in Ravenel, showing travel between Charleston and the Ravenel–Hollywood area. At 9:13 p.m., the phone tower near the victim's body registered his phone. At 9:26 p.m., the tower closer to Charleston registered. Every call after 9:26 p.m. registered closer to Charleston until the last call at 11:38 p.m. On August 9th, the phone registered in Bluffton at 6:48 a.m. Text messages originated from Drayton's cell phone on August 10th at 5:11 p.m., stating: "[B]aby, do you have a credit or a debit card to get me a room over the phone. I have eighty bucks and I want to save that so I can get on the road in the morning" and "Come up there in the morning. I've got to get away from here." Aycock admitted cell phones occasionally pick up a routed call, appearing to be outside of the normal sphere of travel. He explained a cell phone will pick up the strongest signal and if the frequencies are being used up at that tower, it will go to another tower. He also explained that at the edge of the radius of a tower's reach, a cell phone begins searching for the next tower.

Dr. Susan Erin Presnell, a forensic pathologist, testified she performed an autopsy on the victim. She had several abrasions and bruises on her face, lacerations on her upper and lower left lip, cuts and/or scrapes on her chest, bruises on her arms and knees, and bruising and contusions on her lower legs. Presnell testified the victim also suffered puncture injuries resulting from a pointed object such as a knife, screwdriver, or icepick. The victim suffered two punctures and a cut to her lower right chest, a cut through the web of the left thumb down to the bone, and small cuts on the right hand. The victim also suffered gaping cuts to her neck that severed the carotid artery, the neck muscles, the thyroid

gland, the trachea, and the esophagus. Of the punctures to the victim's neck, Presnell opined the injury to the carotid artery caused the victim's death. Presnell also testified hemorrhages across the victim's eyes and face indicated strangulation. Thus, Presnell "felt pretty comfortable that cause of death ... [was] carotid artery transection from the sharp-force injury. But there ... was likely some amount of neck compression or ... strangulation." Presnell also described thermal injury to the victim's skin from burning, but she opined it likely occurred after death.

During cross-examination, Drayton's counsel questioned Presnell regarding the toxicology report performed on the victim. The State objected when counsel asked Presnell about buprenorphine, a narcotic. Outside the presence of the jury, the parties argued about the admissibility of the toxicology report, which indicated the victim "had a blend of different drugs that included not just the kind of opiates that she was allegedly going to look for, but that she had somehow acquired a significant quantity of amphetamines that were in her system at the time and other depressants like ... Prozac and marijuana...." Counsel argued the existence of unexplained drugs in her system "undercuts the State's circumstantial evidence." The State argued it was irrelevant and proffered Presnell's testimony that she would not be comfortable testifying as to when the victim had ingested the drugs and a toxicologist would be more appropriate to testify regarding the matter. Citing Rule 403, SCRE, the trial court excluded the evidence.

The jury convicted Drayton of murder, and the trial court sentenced Drayton to life imprisonment without the possibility of parole. This appeal followed.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only, and is bound by the trial court's factual findings unless those findings are clearly erroneous. *State v. Edwards*, 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009). Thus, on review, the court is limited to determining whether the trial court abused its discretion. *Id.* An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law. *State v. Black*, 400 S.C. 10, 16,

732 S.E.2d 880, 884 (2012). The appellate court "does not reevaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence." *Edwards*, 384 S.C. at 508, 682 S.E.2d at 822.

## LAW/ANALYSIS

### I. Jury Charge

■ Drayton argues the trial court erred in denying his request for the "reasonable hypothesis" circumstantial evidence jury charge. We disagree.

The trial court instructed the jury on circumstantial evidence as follows:

> There are two types of evidence which are generally presented during trial. Direct evidence is the testimony of a person who claims to have actual knowledge of a fact, such as an eyewitness. It is evidence which immediately establishes a fact to be proven. Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact. It is evidence which immediately establishes collateral facts from which the main fact may be inferred. Circumstantial evidence is based on inference and not on personal knowledge or observation. The law makes absolutely no distinction between the weight or value to be given to either direct or circumstantial evidence, nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should weigh all of the evidence in the case. After weighing all the evidence[,] if you're not convinced of the guilt of the defendant beyond a reasonable doubt, you must find the defendant not guilty.

Drayton objected to the charge on circumstantial evidence, arguing the trend in the cases was to return to the "reasonable hypothesis" language used for directed verdict issues. He further argued it was "patently misleading" to instruct jurors that there was no difference between direct and circumstantial evidence. In requesting his jury charge, Drayton relied upon the "reasonable hypothesis" language discussed in *State v. Edwards*, 298 S.C. 272, 275, 379 S.E.2d 888, 889 (1989), *abrogated by State v. Cherry*, 361 S.C. 588, 597, 606 S.E.2d 475, 480 (2004) (holding that the language in *State v.*

*Grippon,* 327 S.C. 79, 83–84, 489 S.E.2d 462, 462 (1997), "is the sole remaining charge to be utilized by the courts of this state in instructing juries in cases relying, in whole or in part, on circumstantial evidence"). Citing *Edwards,* Drayton requested the following jury charge:

> Every circumstance relied upon by the state [must] be proven beyond a reasonable doubt; and . . . all of the circumstances so proven be consistent with each other and taken together, point conclusively to the guilt of the accused *to the exclusion of every other reasonable hypothesis.* It is not sufficient that they create a probability, though a strong one and if, assuming them to be true they may be accounted for upon any reasonable hypothesis which does not include the guilty [sic] of the accused, the proof has failed.

(emphasis added). The court denied the request.

 In reviewing jury charges for error, this court reviews the charge as a whole and in light of the evidence and issues presented at trial. *State v. Brandt,* 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011). A jury charge is correct if when read as a whole, it adequately explains the law. *Id.* A jury charge that is substantially correct and covers the law does not require reversal. *Id.*

Our supreme court found no error by the trial court in *Grippon,* 327 S.C. at 82, 489 S.E.2d at 463, when it refused to charge the phrase "to the exclusion of every other reasonable hypothesis," and in *State v. Logan,* 405 S.C. 83, 90, 747 S.E.2d 444, 447 (2013), our supreme court found the circuit court did not err in providing a circumstantial evidence charge consistent with *Grippon.* The *Logan* court also noted that "erroneous jury instructions are subject to harmless error analysis" and that due to other jury charges provided by the circuit court, the "instruction, as a whole, properly conveyed the applicable law." 405 S.C. at 94 n. 8, 747 S.E.2d at 449 n. 8.

The court in *Logan* held the following circumstantial evidence charge, and a proper reasonable doubt charge, should be given when requested by a defendant:

> There are two types of evidence which are generally presented during a trial—direct evidence and circumstantial evidence. Direct evidence directly proves the existence of a fact and does not require deduction. Circumstantial evi-

dence is proof of a chain of facts and circumstances indicating the existence of a fact.

Crimes may be proven by circumstantial evidence. *The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence, however, to the extent the State relies on circumstantial evidence, all of the circumstances must be consistent with each other, and when taken together, point conclusively to the guilt of the accused beyond a reasonable doubt. If these circumstances merely portray the defendant's behavior as suspicious, the proof has failed.*

The State has the burden of proving the defendant guilty beyond a reasonable doubt. This burden rests with the State regardless of whether the State relies on direct evidence, circumstantial evidence, or some combination of the two.

405 S.C. at 99, 747 S.E.2d at 452 (emphasis added).

The court explained its holding did "not prevent the trial court from issuing the circumstantial evidence charge provided in *Grippon* and *Cherry*. However, trial courts may not exclusively rely on that charge over a defendant's objection." *Id.* at 100, 747 S.E.2d at 452–53. The court continued:

Our *Grippon* and *Cherry* decisions commendably sought to remove confusion from the jury's consideration regarding the weight and value afforded to circumstantial evidence. However, at times, a separate framework is necessary to the jury's analysis of circumstantial evidence. Thus, we modify *Grippon* and *Cherry* to allow the additional language provided above if requested by a defendant.

*Id.* at 100, 747 S.E.2d at 453.

■ Initially, we agree with Drayton's argument that he should benefit from the *Logan* rule because his case was pending on direct review and the issue was preserved. *See State v. Jenkins*, 408 S.C. 560, 572, 759 S.E.2d 759, 765 (Ct.App.2014) (finding *Logan* applies to "cases pending on appeal at the time the *Logan* opinion was published"). However, this court in *Jenkins* nevertheless affirmed, applying the harmless error analysis and explaining, "Our supreme court has excluded the 'reasonable hypothesis' language from the circumstantial evidence instruction now required by *Logan*,

recognizing that this language is unnecessary." *Id.* at 572–73, 759 S.E.2d at 766 (finding "any error in the omission of other language from the *Logan* instruction was harmless beyond a reasonable doubt because the trial court's instruction, as a whole, properly conveyed the applicable law). The court next reviewed the trial court's jury instruction on reasonable doubt, which immediately preceded the circumstantial evidence charge, and found it to be a correct statement of the law." *Id.* at 573, 759 S.E.2d at 766. The court concluded the instructions, "as a whole, properly conveyed the applicable law." *Id.* at 573–74, 759 S.E.2d at 766.

The trial court in this case charged the jury on reasonable doubt immediately before charging the law on circumstantial evidence, and we find the reasonable doubt instruction to be a correct statement of the law. As this court concluded in *Jenkins*, we conclude the trial court's instructions in the present case, as a whole, properly conveyed the applicable law. Accordingly, we find no reversible error in the jury charge.

## II. Admission of Cellular Data

Drayton argues the trial court erred in admitting the historical cell service location information obtained from his cellular service provider because the trial court construed the warrant as a court order and there was not probable cause to issue a warrant. We disagree.

There were five warrants issued to obtain cell records: Drayton's primary cell number, Drayton's alternate cell number, and the records regarding Bartley, the victim, and Hooper. Drayton argued all five warrants violated his right to privacy. The court (1) found the warrant was against Verizon; (2) found Drayton had standing to challenge the warrant; and (3) followed "the long line of federal cases that have stated there's no expectation of privacy as to records." The court found reasonable grounds for the warrant under the Federal Stored Communications Act and probable cause was not necessary to obtain the records.

The warrant sought:

Any and all information in reference to the Verizon cellular telephone number 843–[xxx–xxxx] to include but not limited to subscriber information, account comments, billing rec-

ords, outbound and inbound calls to include blocked call information from August 06, 2010 to August 10, 2010. Subscriber information on other numbers listed in the report, call origination location, physical address of cell sites and coverage map, all stored communications, or files, including voice mail, email, digital images, text messages, buddy lists, and any other files associated with the cellular target number. . . .

The affidavit in support of the warrant read as follows:

That on July [1] 09, 2010, Charleston County Sheriff's Office Deputies responded to Old Jacksonboro Rd near Hwy 174 in reference to a deceased person. Upon arrival deputies discovered the body of a female victim on the side of Jacksonboro Rd. On August 09, 2010, [the victim] was reported missing to the Beaufort County Sheriff's Office. The body of the deceased was later positively identified as being [the victim]. Mike Bartley[,] the fiancée of the victim[,] stated that he last spoke with the victim on August 08, 2010 and she informed him that she was traveling to Charleston SC with Darryl Drayton AKA "D." . . . Bartley provided the Verizon cellular telephone number 843–[xxx–xxxx] as a contact number for Darryl Drayton. It is believed that the call log and information contained therein will provide information that is pertinent to the death [i]nvestigation. All evidence being sought will be compared with evidence already obtained in the investigation.

"To claim protection under the Fourth Amendment of the U.S. Constitution, defendants must show that they have a legitimate expectation of privacy in the place searched." *State v. Missouri*, 361 S.C. 107, 112, 603 S.E.2d 594, 596 (2004). "A legitimate expectation of privacy is both subjective and objective in nature: the defendant must show (1) he had a subjective expectation of not being discovered, and (2) the expectation is one that society recognizes as reasonable." *Id.*

 Under our analysis of the cases interpreting the United States Fourth Amendment, we find Drayton did not have a legitimate expectation of privacy in his historical cell site location records. First, the Stored Communication Act

---

1. This appears to be a typographical error in each of the search warrant affidavits.

requires only a showing of "specific and articulable facts" is necessary for the issuance of a search warrant. *See* 18 U.S.C. § 2703(d) (Supp.2014); *see generally* Elizabeth Elliott, *United States v. Jones: The (Hopefully Temporary) Derailment of Cell–Site Location Information Protection*, 15 Loy. J. Pub. Int. L. 1, 3 (2013) ("Currently under the Stored Communications Act . . ., criminal investigators can obtain cell-site location data with only a showing of 'specific and articulable facts'." (quoting § 2703(d))). Second, the federal courts have found no expectation of privacy in historical data records. *See United States v. Graham*, 846 F.Supp.2d 384, 389–90 (D.Md. 2012) (stating "[a] majority of courts . . . have concluded that the acquisition of historical cell site location data pursuant to the Stored Communications Act's specific and articulable facts standard does not implicate the Fourth Amendment"). *But see Tracey v. State*, 152 So.3d 504, 515 (Fla.Sup.Ct. filed Oct. 16, 2014) (noting "as to 'historical' cell site location information, the federal courts are in some disagreement as to whether probable cause or simply specific and articulable facts are required for authorization to access such information").

Drayton next argues even if he did not have an expectation to privacy in historical cell site location information under the Federal Constitution, he did under the South Carolina Constitution, which our supreme court in *State v. Forrester*, 343 S.C. 637, 645, 541 S.E.2d 837, 841 (2001), interpreted as "offering a higher level of privacy protection than the [Federal] Fourth Amendment."

 In South Carolina, the right to privacy is specifically imbedded in our State Constitution, and our supreme court has recognized that "[s]tate courts may afford more expansive rights under state constitutional provisions than the rights which are conferred by the Federal Constitution." *State v. Easler*, 327 S.C. 121, 131 n. 13, 489 S.E.2d 617, 622 n. 13 (1997). "[T]he federal Constitution sets the floor for individual rights while the state constitution establishes the ceiling." *Forrester*, 343 S.C. at 647, 541 S.E.2d at 842; *id.* at 643, 541 S.E.2d at 840 ("[T]he drafters of our state constitution's right to privacy provision were principally concerned with the emergence of new electronic technologies that increased the government's ability to conduct searches.").

We recognize recent United States Supreme Court and South Carolina Supreme Court cases are more stringently viewing electronic *surveillance* vis-à-vis the right to privacy. *See United States v. Jones*, —— U.S. ——, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012) (finding a global positioning system tracking device installed on and monitoring a vehicle for twenty-eight days without a valid warrant violated the Fourth Amendment); *Kyllo v. United States*, 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (finding a thermal imaging device used to scan a home for levels of heat, utilized without a warrant, was an unlawful search); *State v. Adams*, 409 S.C. 641, 646, 763 S.E.2d 341, 344 (2014) (recognizing the court of appeals found a constitutional violation when a GPS device was installed and monitored without a court order, a finding the State did not appeal). However, the evidence sought in this case was not obtained via electronic surveillance; rather, it was sought as business records of Verizon. The South Carolina appellate courts have not addressed historical cell site location data under the South Carolina Constitution. Accordingly, we rely on the federal precedent and find Drayton did not have a reasonable expectation of privacy in his historical cell site location data because he voluntarily contracted with the cellular provider, thereby conveying his cell site location data to the provider who created the records in the ordinary course of business. *See Graham*, 846 F.Supp.2d at 389 (explaining courts that have found no expectation of privacy in historical cell site location data "have concluded that because people voluntarily convey their cell site location data to their cellular providers, they relinquish any expectation of privacy over those records").

Because we find Drayton did not have a reasonable expectation of privacy in the historical cell site location data, we need not reach his argument that there was no probable cause to issue the warrant. *See State v. Crane*, 296 S.C. 336, 341, 372 S.E.2d 587, 589 (1988) (finding because the appellant could not "make the threshold demonstration of a legitimate expectation of privacy in connection with the searched premises," he was not entitled to challenge whether the magistrate had probable cause to issue the warrant). We also find no merit to Drayton's argument that the trial court erred in designating the search warrant as a court order rather than a warrant. *See*

*State v. King*, 367 S.C. 131, 136, 623 S.E.2d 865, 867 (Ct.App. 2005) ("Error without prejudice does not warrant reversal."); *see also* Rule 220(b)(2), SCACR ("The Court of Appeals need not address a point which is manifestly without merit.").

### III. Limitation of Cross–Examination

█ Drayton lastly argues the trial court erred in limiting his cross-examination of the pathologist concerning the toxicology report relating to the victim. We disagree.

█ The trial court found the evidence was not relevant under Rule 403, SCRE, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to admit or exclude evidence "is within the circuit court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Dickerson*, 395 S.C. 101, 116, 716 S.E.2d 895, 903 (2011).

█ We find no error in the exclusion of the evidence. Furthermore, any error in its exclusion was not reversible because the evidence was cumulative to numerous other references in the record regarding the victim's illegal drug use. *See State v. Patterson*, 290 S.C. 523, 528, 351 S.E.2d 853, 856 (1986) (finding any error in the exclusion of evidence that was cumulative to other evidence entered was harmless beyond a reasonable doubt).

### CONCLUSION

For the foregoing reasons, Drayton's conviction and sentence is **AFFIRMED**.

HUFF and KONDUROS, JJ., concur.